# EXHIBIT 2



# OPERATING AGREEMENT

## OF

# WORLDWIDE CAPITAL MANAGEMENT, LLC

THE MEMBER INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, EITHER PURSUANT TO APPLICABLE EXEMPTIONS OR BECAUSE THE MEMBER INTERESTS ARE NOT SECURITIES. WITHOUT SUCH REGISTRATION, THESE MEMBER INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EST THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO DEVELOPER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE DEVELOPER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE DEVELOPER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE MEMBER INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THIS AGREEMENT.

# OPERATING AGREEMENT
## OF
## WORLDWIDE CAPITAL MANAGEMENT, LLC

**THIS OPERATING AGREEMENT**, dated as of December 21, 2010, (the "**Agreement**"), by and between **WORLDWIDE CAPITAL MANAGEMENT, LLC**, a Delaware limited liability company (the "**Company**"), and such persons as hereafter become members in accordance with the provisions of the Agreement and the Delaware Limited Liability Act by executing or causing to be executed a signature page in the form attached hereto (the "**Investing Members**").

## BACKGROUND INFORMATION

The Investing Members desire to form a limited liability company pursuant to the laws of the State of Delaware for the purpose described below.  To that end the Developer has prepared, executed and filed with the Delaware Secretary of State Certificate of Formation and has agreed to issue to the Investing Members units of Membership Interest described herein. Accordingly, in consideration of the mutual promises contained herein, the Investing Members agree as follows:

## OPERATIVE PROVISIONS

1.    **DEFINITIONS**.

As used herein, the quoted terms shall have the following meanings:

1.1    "<u>Accountants</u>" means such firm of independent certified public accountants as may be engaged from time to time by the Board to provide professional services to the Company.

8903004.8

1.2    "Act" means the Securities Act of 1933, as amended.

1.3    "Administrative Agent" or "Agent" means the independent agent that will be appointed by the Company to provide administrative services to the Company pursuant to the Administrative Agreement.

1.4    "Administrative Agreement" means the agreement by which the Administrative Agent shall serve the Company in connection with the administration of the Company.

1.5    "Affiliate" shall have the meaning set forth in Rule 405 promulgated under the Act, except as otherwise provided herein.

1.6    "Adjusted Capital Account Balance" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments.

(1)    Increase such balance by any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate (second to last) sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(1)(5); and

(2)    Decrease such balance by such Members share of the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith. The calculation of the Adjusted Capital Account Balance of a Member shall exclude any Section 754 election.

1.7    "Adjusted Capital Contribution" means, with respect to any Member, the aggregate amount of such Member's Capital Contributions, as at any given point in time, reduced by the amount of cash (if any) distributed to such Member's pursuant to Section 10.6 and Section 10.7. In the event that any Member transfers all or any portion of its Interest in accordance with the terms of this Agreement, its transferee shall succeed to the Adjusted Capital Contribution of the transferor to the extent it relates to the transferred Interest.

1.8    "Aggregate Commitments" means the aggregate Commitments shall be deemed to hold a portion of the Aggregate Commitments equal to its Commitment.

1.9    "Bankruptcy" As used in this Agreement, the term "Bankruptcy," with respect to a specified Person shall refer to: (i) the appointment of a receiver, conservator, rehabilitator or similar officer for the specified Person, unless the appointment of such officer shall be challenged in an application filed within thirty (30) days after the appointment and the appointment is vacated and such officer discharged within one hundred twenty (120) days of the appointment; (ii) the taking of possession of, or the assumption of control over, all or any substantial part of the property of the specified Person by any receiver, conservator, rehabilitator or similar officer or by the United States government or any agency thereof, unless such possession or control is challenged in an application filed within thirty (30) days after such possession or control is taken and property is relinquished

8903004.8                                                2

within one hundred twenty (120) days of the taking; (iii) the filing of a petition in bankruptcy or the commencement of any proceeding under any present or future federal or state law relating to bankruptcy, insolvency, debt relief or reorganization of debtors by or against the specified Person, provided, if filed against (and not by) the specified Person, such petition or proceeding is not challenged within thirty (30) days after it is filed and if so challenged is not dismissed within one hundred twenty (120) days of the filing of the petition or the commencement of the proceeding; or (iv) the making of an assignment for the benefit of creditors or a private composition, arrangement or adjustment with the creditors of the specified Person.

1.10    "Base Rate" means, on any date, a variable rate per annum equal to the rate of interest published, from time to time, by The Wall Street Journal as the "prime rate" at large U.S. money center banks.

1.11    "Board of Managing Members" The Developer shall have the right to appoint no less than three (3) and no more than seven (7) Members of the Company to serve as a "Board of Managing Members" for the Company (the "Board"). The Board shall have the authority to make all material decisions on behalf of the Company and provide guidance and direction to the Manager hereunder, who will be serving in an administrative role. The Members of the Board may be removed, replaced and added by a Majority in Interest vote of the Members.

1.12    "Capital Account" means, with respect to any Member, the sum of his, her or its paid-in Capital Contribution (a) increased by all profits allocated to such Member; and (b) decreased by (i) the amount of all cash distributions to such Member, and (ii) all losses allocated to such Member. Otherwise, each Member's Capital Account shall be maintained and adjusted in accordance with the Code and the Treasury Regulations thereunder, including expressly, but not by way of limitation, the adjustments to Capital Accounts permitted by Section 704(b) of the Code and the Treasury Regulations thereunder in the case of a Member who receives the benefit or detriment of any special basis adjustment under Sections 734, 743 and 754 of the Code.

1.13    "Capital Contributions" means the total cash contributed to the Company by the Members pursuant to the terms of the Operating Agreement. Any reference to the Capital Contribution of a Member shall include the Capital Contribution made by a predecessor holder of the interest of such Member.

1.14    "Cash Distributions" means the Cash Flow distributions a set forth in Section 10.6 hereof.

1.15    "Cash Flow" means the total Capital Contribution of each Member for the relevant period, the total cash receipts of the Company, plus any other funds (including amounts designated as reserves by the Board, where and to the extent it no longer regards such reserves as reasonably necessary to the efficient conduct of the Company's business) deemed available for distribution and designated as Cash Flow by the Board less (a) any operating expenses of the Company excluding any expense not involving a cash expenditure, such as amounts charged for depreciation; (b) all payments of principal and interest on account of any Loans secured by Company property or any other Company obligations or loans, including loans made to the Company by any Members; (c) expenditures for capital expenditures or improvements (except to the extent financed through

mortgages on Company property or any other Company borrowing or loans, or reserves previously set aside by the Company for such purposes); and (d) reserves for working capital and anticipated expenditures in such amounts as may be determined from time to time by the Board, including the acquisition of replacement Properties.  Cash Flow shall be determined separately for each fiscal year of the Company.

1.16    "Center" means the 370,000+/- square-foot proton center to be developed near SUNY Downtown Medical Center in the New York City, New York, area.

1.17    "Certificate" means the valid Certificate of Organization, duly filed in its original or any amended form in accordance with (and in all respects sufficient in form and substance under) the laws of the State of Delaware.

1.18    "Code" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent laws.

1.19    "Commitment" means, with respect to each Member, the aggregate amount of cash agreed to be contributed as capital to the Company by such Member.

1.20    "Company" means the limited liability company subject to this Agreement, in its existing or any amended or reconstituted form.

1.21    "Developer" or "Owner"  The Proton Institute of New York, LLC ("TPIoNY"), the owner and developer of the Center.

1.22    "EB-5 Application"  An I-526 Immigration Petition for Entrepreneur filed by the Company with the USCIS on behalf of an Investing Member, such Investing Member's spouse and/or unmarried minor children, as determined by such Investing Member, which I-526 Petition, if granted, converts the Investing Member to a Member and permits the Member and the Member's spouse and unmarried minor children to apply for admission as a conditional lawful permanent resident.

1.23    "EB-5 Conditional Approval"  This shall mean the approval by the USCIS of a Investing Member's EB-5 Application.

1.24    "Escrow Agent"  RBC Bank (US), a division of the Royal Bank of Canada, or its successor, appointed as such under the Escrow Agreement.

1.25    "Escrow Agreement"  That certain Escrow Agreement between the Escrow Agent and the Company and each subscriber in the Offering, pursuant to which the Escrow Agent will hold and disburse funds in the Expense Escrow Account and Project Escrow Account.

1.26    "Expense Escrow Account"  An account maintained by the Escrow Agent into which Fifty Thousand Dollars ($50,000) of a Member's Capital Contribution pursuant to the Offering will be deposited and from which expenses allocated to that Member will be disbursed to the Company to reimburse expenses of the Developer, Offering, migration services and the legal fees for immigration counsel retained by the Company to file the EB-5 Application for such Member. Funds deposited in

the Expense Escrow Account by that Member shall be treated as Capital Contributions to the Company.

1.27   "Family Member"  With reference to a specified Person, this shall mean that Person's spouse, lineal ancestors or descendants, or siblings (all whether by blood, law or marriage), and trusts for the exclusive benefit of that specified Person or any of the foregoing relatives of that specified Person.

1.28   "Interest" means the ownership interest of each Member in the Company.

1.29   "Investing Member" or "Member" means any person executing this Agreement or causing the same to be executed as a Investing Member, as well as any other person acquiring any portion of one or more Units from a Investing Member and admitted to the Company as a substitute Investing Member.

1.30   "Investing Member Interests" or "Interests" means the total equity interests in the Company offered to and purchased by the Investing Members.

1.31   "Limited Liability Company Act" means the Delaware Revised Limited Liability Company Act.

1.32   "Loan" or "Loans" means any mortgage loans that encumber the Project or are otherwise made for the benefit of the Project.

1.33   "Loan Agreement"  This shall have the meaning set forth in Section 4.1(b) hereof.

1.34   "Majority in Interest" means, Members owning in the aggregate more than 50% of the Units then outstanding.

1.35   "Management" means the Persons involved in the management of the Center on behalf of the Developer.

1.36   "Net Capital Contribution" means the total Capital Contributions of each Member made to the Company.

1.37   "Officer"  The Persons, if any, appointed by the Board to perform specified executive functions for the Company, as specified further in Section 8.10 hereof.

1.38   "Permanent Disability" or "Permanently Disabled"  When used with reference to a specified Person, this shall mean (i) any mental or physical illness, condition or incapacity which prevents the specified Person from performing his or her duties on behalf of the Company or any of its Affiliates for a period of 180 substantially consecutive days during any 365 day period, (ii) a determination by an insurer that has issued a disability insurance policy to the Company or one or more Members or the Board with respect to a Person that such Person is permanently disabled as defined in such policy, or (iii) the determination by a court of competent jurisdiction that the specified Person is legally incompetent.

1.39    "Person" means an individual, a partnership (general, limited or limited liability), a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental, quasi-governmental, judicial or regulatory entity or any department, agency or political subdivision thereof.

1.40    "Plan Asset Regulations" means the U.S. Department of Labor plan asset regulations, 29 C.F.R. §2510.3-101.

1.41    "Private Placement Memorandum" or "Offering Statement" or "Offering Memorandum" or "PPM" means the offering memorandum utilized by the Company to sell Units.

1.42    "Profits and Losses": Profits and Losses means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, including gain or loss from Capital Transactions, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)      Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-l(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(iii)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)      In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of "Depreciation";

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation Section 1.704-l(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in complete liquidation of a Member's Member Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the

disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii)    Notwithstanding any other provision of this Section, any items which are specially allocated pursuant to Section 10.12 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 10.12 shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

1.43    "Project" means the approximately 370,000 square feet specialized proton center to be developed by the Developer near the SUNY Downstate Medical Center in New York City, New York.

1.44    "Project Escrow Account" An account maintained by the Escrow Agent into which Five Hundred Thousand Dollars ($500,000) of a subscriber's subscription price in the Offering shall be deposited and which shall be disbursed to the Company upon such subscriber becoming a permanent Member whose Interest is not subject to cancellation due to EB-5 Application disqualification. Funds deposited in the Project Escrow Account by a Member shall be treated as Capital Contributions to the Company by that Member

1.45    "Short-Term Investments" means (i) cash or cash equivalents, (ii) commercial paper rated no lower than "A-1" by Standard & Poors Rating Services or "P-1" by Moody's Investors Service, Inc., (iii) United States or other government obligations, (iv) state or municipal governmental obligations or money market instruments having equivalent credit ratings to the securities listed in clause (ii) above, (v) certificates of deposit issued by, or other deposit obligations of, commercial banks chartered by the United States or a state thereof or the District of Columbia, Canada, Australia or other nation each having combined capital and surplus of at least $100,000,000, (vi) overnight repurchase agreements with primary Fed dealers collateralized by direct United States Government obligations, (vii) pooled investment vehicles or accounts that invest only in securities or instruments of the type described in clauses (i) through (vi) above, and (viii) other similar obligations and securities having equivalent credit ratings to the securities listed in clause (ii) above, in each case maturing in one year or less at the time of investment by the Company.

1.46    "Subscription Agreement" means the Subscription Agreement utilized by the Company to sell Units to Investing Members, including all attachments thereto.

1.47    "Supervisory Agent" means the designated agent that will provide the supervisory services related to the Loan.

1.48    "Supervisory Agreement" means the agreement between the Company and the Supervising agent to provide services related to the disbursement of the Loan.

1.49    "Tax Services" means the tax services to be provided by the independent certified public accountant appointed by the Board (or by the Administrative Agent on behalf of the Board).

8903004.8                                                7

1.50    "Unit" shall mean a single unit of an Investing Member Interest, the acquisition of which shall entitle the holder thereof to the rights and benefits specified in this Agreement.

1.51    "Units" means a Two Hundred Fifty Million Dollars ($250,000,000) maximum of Membership Interests in the Company, which shall entitle the holder to the rights under this Agreement.

1.52    "USCIS"  The United States Citizenship and Immigration Services.

2.    **FORMATION.**

The Members hereby constitute a limited liability company pursuant to the Company Act and other applicable laws of the State of Delaware.

3.    **NAME AND PLACE OF BUSINESS.**

The name of the Company is **"WORLDWIDE CAPITAL MANAGEMENT, LLC"** or such other name as the Board shall hereafter designate by written notice to the Investing Members. Its principal mailing address shall be in c/o the Administrative Agent: MarcumRachlin, located at Las Olas Centre, 450 E. Las Olas Boulevard, Ninth Floor, Fort Lauderdale, FL 33301, Attn: David Appel, or such other location as the Board may from time to time designate by notice to the Investing Members.

4.    **PURPOSE AND SCOPE OF PARTNERSHIP.**

4.1    (a)    The Company has been formed for the sole purpose of lending monies to the Center in accordance with the terms and conditions set forth in the PPM.

(b)    Initially, the Developer, shall apply with the USCIS to obtain a designation as a "Regional Center" for a geographic area that includes the Project, to facilitate the filing of EB-5 Applications, and shall file an EB-5 Application on behalf of each of its Investing Members to allow such Investing Member, along with their spouse and unmarried minor children, as applicable and as determined by the Investing Member, to obtain EB-5 Conditional Approval and then seek conditional lawful permanent residence in the United States.  As its principal business, the Company shall loan monies to the Center pursuant to the loan terms described in the Confidential Private Placement Memorandum (the "Loan") and a Loan Agreement to be entered into with the Developer.  In furtherance of the foregoing, but in no way limiting the generality of the foregoing, the Company may: (i) enter into, perform and carry out contracts and agreements as may be necessary, appropriate or incidental to the accomplishment of the purposes of the Company, and (ii) do all other acts and things which may be necessary, appropriate or incidental to the carrying out of the business and purposes of the Company.

4.2    Other Business Ventures:  Any Member or any officer, director, employee, stockholder or other person holding a legal or beneficial interest in any entity which is a Member, may engage or possess an interest in other business ventures of every nature and description, independently or with others, and neither the Company nor any Member shall have any right by virtue of this Agreement in or to such independent ventures or the income or profits derived therefrom;

provided that nothing contained in this Section is intended to absolve a Board from any liability to the Company or the Investing Members arising as a result of a breach of any material fiduciary obligation owing to the Company or any Member.

5.    **TITLE.**

Title to any property and to any other assets acquired to affect the purposes of the Company shall be held in the name of the Company. The Board and/or its designee shall execute and file in all appropriate locations such documents, if any, as may be necessary to reflect the Company's ownership directly or indirectly in the Loan(s).

6.    **COMMENCEMENT, TERM.**

The Company shall be deemed to commence its existence as of the date of this Agreement. The term of the Company shall continue until December 31, 2025, unless sooner terminated in accordance with the provisions of Section 11 hereof, or as otherwise provided by law.

7.    **CAPITAL CONTRIBUTIONS.**

7.1    <u>Investing Members</u>:  Each Investing Member shall contribute to the capital of the Company the amounts set forth in Schedule 1 attached to this Agreement, in return for which they shall receive the Membership Interest described in <u>Schedule 1</u>. The total amount to be contributed by each Investing Member shall be paid to the Company $50,000 per Unit upon admission to the Company, and the balance of $500,000 per Unit as set forth in the Subscription Agreement.

7.2    <u>No Additional Contributions</u>: The Investing Members are not required to contribute additional capital or lend funds to the Company.

7.3    <u>Capital Accounts</u>:  The Company shall establish for each Member a Capital Account. Voluntary loans by any Member shall not be considered contributions to the capital of the Company.

7.4    <u>Withdrawal and Return of Capital</u>:  Except upon dissolution of the Company (subject to the provisions of Section 11 hereof), no Member may withdraw any capital from the Company without the consent of the Board or, if the Member proposing to withdraw capital is the Board, without the consent of a Majority in Interest of Investing Members. Under circumstances causing a return of a capital contribution, no Member shall have the right to receive property other than cash, except as may otherwise be specifically provided herein, nor to be paid interest on such contributions with respect to the period held by the Company.

7.5    <u>Portfolio Loan Treatment</u>.  Notwithstanding anything herein to the contrary, the Board will maintain separate accounts for each Investing Member proportionate to the amount funded by the Investing Member to the Company which is in turn loaned to the Center. Each Investing Member will be deemed to have made a direct portfolio loan (as such term is defined in 871(h) of the Internal Revenue Code) to the Center. Assuming that each Investing Member meets the specific requirements of Code Section 871(h), the Accountant's shall file the Company tax return reflecting minimal activity and the Interest on the portfolio loan should be tax free to each Investing Member.  In the event that an Investing Member's contribution fails to qualify as a Portfolio Loan, then in that event occurring,

the Accountants shall treat the contribution to the Company by such Investing Member as a capital contribution and the interest allocable to such Investing Member in accordance with the provisions above and applicable withholding will apply to same.  No assurance or guarantee is made that the IRS will accept the characterization of the Investing Member capital contributions as portfolio loans and accept the treatment of the interest as tax free portfolio interest.

## 8.  RIGHTS AND DUTIES OF THE BOARD.

8.1    Management of Company Business:    With the direction of the Board, the Administrative Agent shall have the authority and discretion to administer the Company's business. The Administrative Agent may from time to time seek the discretion of the Board in making any decisions related to the Business, although it shall not be required to seek direction except where there is a material modification of the purpose of the Company or a material modification of the Loan Agreement.  The exercise of any power conferred by this Agreement on the Administrative Agent shall constitute the act of and be binding upon the Company.  The Company shall follow the lending guidelines set forth in the PPM in connection with the making of the Loan and seek direction and approval of the Board with respect to any material modifications to the Loan Agreement.

8.2    Specific Rights and Powers:    In addition to any other rights and powers which it may possess under law, but subject to the provisions of Section 4 and Subsection 8.3 below, the Board and/or its designated agents shall have such other rights and powers required for or appropriate to its management of the Company's business, which, by way of illustration but not limitation, shall include the following:

(1)    to enter into any contract of insurance which the Board may reasonably deem appropriate for the protection or conservation of Company property, or for any other purpose beneficial to the Company;

(2)    to employ attorneys, agents, consultants, accountants and other independent contractors to perform services on behalf of the Company, including Affiliates of the Board; provided that such services are reasonably necessary or advisable and the compensation therefor is reasonable;

(3)    to bring or defend legal actions in the name of the Company, pay, collect, compromise, arbitrate, or otherwise adjust or settle claims or demands of or against the Company or its agents;

(4)    to establish reasonable reserve funds from income derived from the Loan in connection with its administration;

(5)    to perform or cause to be performed all of the Company's obligations under any agreement to which the Company is a party;

(6)    to make the Loan and from time to time modify the conditions of same if reasonably necessary and engage the Supervisory Agent pursuant to a Supervisory Agreement to administer the disbursement of the Loan proceeds;

(7)     to engage the Administrative Agent to provide administrative services to the Company pursuant to the Administrative Agreement; and

(8)     to execute, acknowledge and deliver any and all instruments necessary to effectuate any of the foregoing.

8.3     <u>Limitations on Board Authority</u>:  Notwithstanding anything to the contrary herein contained and subject to the provisions of Article 4, without in each instance receiving the prior written consent of the Board, the Board shall not have the authority to:

(1)     lend Company funds to any person other than in connection with the Loan or in the ordinary course of business;

(2)     perform any act which would make it impossible to carry on the ordinary business of the Company or which would be in contravention of the express terms of this Agreement;

(3)     admit a person as a Investing Member other than as provided herein;

(4)     perform any act that would subject any Investing Member to liability as a general partner in any jurisdiction;

(5)     take any action which would result in the Company being classified other than as a partnership for federal income tax purposes.

8.4     <u>Liability of Administrative Agent to Investing Members and Company;</u> <u>Indemnification</u>:  The Administrative Agent shall be required to devote only so much time and attention to the business affairs of the Company as is reasonably necessary or advisable to competently manage such affairs in accordance with the terms of the Administrative Agreement. Except as otherwise specifically set forth herein, the Administrative Agent nor its Affiliates shall be personally liable to any Investing Member because any taxing authority disallows or adjusts any deduction or credit claimed in a Company income tax return, nor for the repayment of capital contributions of the Investing Members.  The performance of or the omission to perform any act, the effect of which may cause or result in loss or damage to the Company, if performed or omitted in good faith and in accordance with the terms of this Agreement, shall not subject the Administrative Agent nor its Affiliates to any personal liability to either the Company or any Investing Members. The Company, its receiver, or trustee shall indemnify and save harmless the Administrative Agent (including any officer, director or employee of the Administrative Agent) from any claim, loss, expense, liability, action or damage resulting from any such act or omission, including, without limitation, reasonable costs and expenses of litigation and appeal (including reasonable fees and expenses of attorneys engaged by the Administrative Agent in defense of each such act or omission); but the Administrative Agent and its Affiliates shall be entitled to be indemnified or held harmless due to, or arising from, fraud, bad faith, gross negligence, malfeasance or a material failure to comply with any representation, warranty, covenant, condition or other agreement herein contained, and provided further that any indemnification provided for hereunder shall be fully subordinate to the payment and performance of all obligations.

8.5     Special Duties of the Administrative Agent:  In addition to and without limiting the duties and obligations specified or referenced hereunder, the Agent covenants and agrees that it shall advise and take direction from the Board with respect to (a) any independent contractor with or agent of the Company performing and complying with the provisions of any agreement affecting Company property or the operation thereof, and (b) cause the Company to file an amended Certificate and such other documents and to perform such acts as shall be required under Delaware law in order to preserve the valid existence of the Company and the limited liability of the Investing Members.

8.6     Notice Obligation:  The Agent shall immediately give notice to the Board of its knowledge of (a) a default in the performance of any material obligation of any person to the Company which shall have occurred and be continuing under any agreement with the Company; and (b) any other notice of a material default received by the Company.

8.7     Removal; Resignation:

(1)     The Board may, without the consent of the Agent, remove the Agent as an agent of the Company, "with cause."  For purposes of the foregoing, "with cause" shall mean the Agent has been found, in a final, non-appealable judgment of a court of competent jurisdiction, to have engaged in acts or omissions that constitute gross negligence, willful misconduct or fraud as to the Company and/or the Members that have been material and adverse to the Company.

(2)     The Agent may resign as an agent of the Company at any time upon written notice to the Company.

(3)     The Agent shall automatically be removed as an agent of the Company immediately upon its Bankruptcy.

(4)     Upon removal or resignation of the Agent, the removed/resigned Agent shall immediately cease to have any authority to act as an agent for the Company.  Any of the Company funds or other property in the possession or under the control of such removed/resigned Agent shall immediately be released and transferred to its successor or to the Company.  The removed/resigned Agent shall, as applicable, cooperate in the orderly transition of affairs to its successor.

8.8     Election of Successor Agent.  Within thirty (30) days after the removal or resignation of the Agent, the Board shall, elect a successor Agent to serve hereunder.

8.9     Officers.

(a)     Appointment of Officers.  The Company is not required to appoint Officers. If appointed in the discretion of the Board, the Officers of the Company may consist of a President, one or more Vice Presidents, a Treasurer, a Secretary, and one or more Assistant Treasurers or Assistant Secretaries, all as determined by Board.  The scope of authority of each Officer shall be as set forth in Section 8.9(b) hereof or as otherwise established by the Board, and shall at all times be subject to the control and supervision of the Board.  Officers need not be Members, but must be natural persons, as is otherwise required in a corporation governed by the Delaware Business Corporation Act, as amended ("Delaware's Corporate Laws").  The Officers of the Company, if any, shall be appointed by the Board and shall hold office until the Officer's death, resignation, replacement or removal in

accordance with this Agreement.  A person may hold more than one office at the same time, except that the offices of President and Vice President may not be held by the same person. Appointment of an Officer or agent shall not of itself create contract rights between the Company and that Officer or agent.  If approved by the Board, the Company may enter into an employment agreement with any Officer, and the provisions of such employment agreement may supersede any terms and conditions in this Section 8.9(a). A vacancy in any office maybe filled by the Board.

(b)    Authority of Officers.  Subject to limitations or other variances that may be imposed from time to time by the Board, the Officers of the Company may generally exercise the same scope of authority to control and manage the day-to-day operations of the Company, and to act for and bind the Company without the authorization of the Board as the officers of the same or similar titles in a corporation governed by Delaware's Corporate Laws have to control and manage the day-to-day operations and to bind and act for the corporation without the approval of the corporation's board of directors.

(c)    Compensation of Officers.  The Officers, which may include the Board, shall receive such compensation, if any, in the amounts and at the times, as determined from time to time by the Board.

(d)    Contractual Provisions.  The Officers shall have the right and authority to require a provision in all Company contracts that they not be personally liable thereon and that the Person contracting with the Company is to look solely to the Company and its assets for satisfaction.

(e)    Removal and Resignation of Officers.

(i)    The Board may at any time, and from time to time, with or without cause, at its sole discretion, remove an Officer as an officer of the Company, but the removal shall be without prejudice to the contract rights, if any, of the Officer so removed.

(ii)    Unless stated otherwise herein or in any written agreement between the Company and an Officer, an Officer may resign as an Officer of the Company at any time upon written notice to the Board.

(iii)    Upon removal or resignation, a removed/resigned Officer shall immediately cease to have authority to act as an Officer of the Company.  Any Company funds or other property in the possession or under the control of such removed/resigned Officer shall immediately be released and transferred to the Company. A removed/resigned Officer shall cooperate in the orderly transition of affairs to its successor.

(iv)    The removal or resignation of an Officer who is also a Member or their Affiliate shall not affect the Officer's rights as a Member, and shall not constitute a withdrawal of the Member or redemption of their Member Interest, unless provided otherwise in this Agreement or another agreement between the Company and such Person.

9.    **FEES, SALARIES AND EXPENSES.**

9.1    Fees Paid to the Board Members:  The Board Members and/or its Affiliates shall receive such fees as are as set forth in the Private Placement Memorandum and the Administrative Agreement, the Supervisory Agreement and any agreement with the Accountants.

9.2    Expenses:  Except as otherwise provided herein, the Company shall pay all expenses incurred in connection with the formation, operation and administration of the Company, which may include, but are not limited to:

(1)    all costs (including reasonable travel expenses) of personnel, including Affiliates, engaged by the Company which are incurred in the conduct of its business;

(2)    all costs of taxes and assessments levied on Company property and other taxes applicable to the Company;

(3)    printing, engraving and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of an Interest in the Company;

(4)    fees and expenses paid to attorneys, accountants, appraisers, lenders, brokers, consultants, agents and other independent contractors;

(5)    any expense of organizing, revising, converting, terminating or reconstituting the Company or negotiating, drafting, causing the execution of or amending the Operating Agreement, Certificate or other Company documentation;

(6)    expenses in connection with distributions made by the Company to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Investing Members, including the cost of printing and mailing to such persons reports of meetings of the Company;

(7)    expenses in connection with preparing and mailing reports required to be furnished to Investing Members for investor, tax reporting, or other purposes, or such reports as the Board may deem to be in the best interests of the Company;

(8)    costs of any accounting, statistical or bookkeeping equipment necessary for the maintenance of the books and records of the Company;

(9)    costs of preparing and disseminating informational material and documentation relating to any potential sale, refinancing or other disposition of Company property; and

(10)    costs incurred in connection with any litigation in which the Company is involved, as well as in the examination, investigation or other proceedings conducted by any regulatory agency of the Company, including legal and accounting fees incurred in connection therewith.

9.3    Salaries, Drawings and Interest on Capital Accounts:  No Member shall receive any interest on a capital contribution or any salary, either with respect to any capital contribution, for services rendered on behalf of the Company or otherwise in its capacity as Member, except as expressly provided elsewhere in this Agreement.

10.    **PROFITS, LOSSES AND DISTRIBUTIONS.**

10.1    Generally:  The following provisions shall apply with respect to the allocation of profits and losses:

(1)    Profits and losses for all purposes of this Agreement shall be determined in accordance with the accounting method followed by the Company for federal income tax purposes and otherwise in accordance with generally accepted accounting principles.  Every item of income, gain, loss, deduction, credit or tax preference entering into the computation of such profit or loss, or applicable to the period during which such profit or loss was realized, shall be considered allocated to each Member in the same proportion as profits and losses are allocated to such Member below.

(2)    Profits and losses shall be allocated to the Members commencing with the fiscal year ending December 31, 2010, and annually thereafter.

(3)    Allocation of Indebtedness.  The Capital Account of the Contributing Investing Members shall include an initial allocation of Company indebtedness in the amounts for each Contributing Investing Member in accordance with the provisions otherwise set forth in this Agreement.

(4)    Allocation of Profits and Losses.  Except with respect to the repayment of indebtedness and the allocation of any built-in gain provided for under Section 704(c) of the Code, all profits and losses of the Company shall be allocated as set forth hereinafter.

10.2    Allocation Following Transfer of Limited Company Interest:  Except as otherwise provided herein, in any year in which a Investing Member transfers all or any portion of a Limited Company Interest to any person who, during such year, is admitted as a substitute Investing Member, the share of profits, losses and distributable Cash Flow allocated to or attributable to the Limited Company Interest sold, assigned or transferred, shall be divided between the assignor and the assignee on the basis of the number of days in such year before, and the number of days on or after, the execution by the assignee of this Agreement; provided, however, that the assignor and the assignee may by agreement make special provisions for the allocation of items of income, profit, gain, loss, deduction or credit as may from time to time be permitted under the Code, and for the distribution of Cash Flow, but such agreement shall be binding as to the Company only after it shall have received notice thereof from the assignor and assignee.

10.3    Portfolio Interest.  Any amounts deemed to be treated as the return of the Portfolio Loan or Portfolio Interest to each individual Member (assuming same qualifies as treatment as a Portfolio Loan) shall not be treated as profit for purposes of this Section 10.  Likewise, in the event that the Portfolio Loan is not repaid by the Center to the Company and a Member has a loss of all or any portion of their Portfolio Loan, then the matter then occurring same shall not be treated as a loss

for purposes of this Section 10. The profit and loss and distribution sections of this Operating Agreement shall only apply to those amounts to which the Accountants determine fail to qualify as Portfolio Loan or Portfolio Interest, if any.

10.4     No Allocation to Board:  No profits and losses shall be allocated to the Board for its serving in such capacity.

10.5     Apportionment of Allocations and Distributions:  Except as otherwise provided in this Agreement, allocations and distributions to be made to each Member pursuant to this Section 10 shall be made in the proportion that its respective Company Interest bears to the Company Interest of all Members of the same class, measured as of the last day of the period for which such allocation or distribution is made.

10.6     Allocation of Profit and Loss:

(1)     Profits shall be allocated among the Members in the following order of priority:

(a)     First, to the Members in proportion to, and to the extent of, any deficit balances in their respective Adjusted Capital Account Balances, until all such Adjusted Capital Account Balances have been restored to zero;

(b)     Second, among the Members, as necessary to cause the Adjusted Capital Account Balance of the Members to equal their Adjusted Capital Contributions; and

(c)     Third, to the Members in proportion to their respective Interests.

(2)     Losses shall be allocated among the Members in the following order of priority:

(a)     First, to the Investing Members, as necessary to cause the Adjusted Capital Account Balance of the Investing Members to equal the Investing Member's Adjusted Capital Contribution;

(b)     Second, to the Members, as necessary to cause the Adjusted Capital Account Balance to equal zero; and

(c)     Third, to the Members in proportion to their respective Interests.

(3)     Limitation.  The Losses allocated pursuant to Section 10.6(2) shall not exceed the maximum amount of Losses that can be so allocated without causing any Investing Member to have an Adjusted Capital Account Deficit (determined after all cash distributions for the fiscal period) at the end of the fiscal period for which the allocation relates. All Losses in excess of the limitation set forth in the preceding sentence shall be allocated among those Investing Members that will not have an Adjusted Capital Account Deficit at the end of the fiscal period in the ratio of their relative Interests. In any fiscal period in which all of the Investing Members shall have an Adjusted Capital Account Deficit, all Losses in excess of the limitations described in the first two sentences of this Section 10.5(3) shall be allocated to the Board.

10.7   <u>Distribution of Cash Flow to Investing Members</u>:  The Board an/or the Agent shall have the sole authority to determine when Cash Flow is available for distribution among the Members.  Once a determination is made that such a distribution is in order, the same shall be made as follows:

(1)   Cash Flow will be distributed to the Investing Members first to return all and then (2) in accordance with each Investing Member's Interest.

10.8   <u>Liquidating Distributions</u>:  The proceeds resulting from the liquidation of the Company property pursuant to Section 11.2 (but subject to the provisions of Section 11.2(3)), shall be distributed and applied in the following order of priority:

(1)   To the payment of debts and liabilities of the Company, including all expenses of the Company incident to any such liquidation and all loans or any other debts and liabilities of the Company to the Members or their Affiliates;

(2)   To the establishment of any reserves which the liquidating trustee deems reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Company; and

(3)   To the Members in accordance with the provisions of Section 10.6 above.

10.9   <u>Nonrecourse</u>:  Each Member shall look solely to the assets of the Company for all distributions from the Company, the repayment of his Capital Contributions, and the repayment of any loans previously made to the Company when all such payments are due hereunder, and shall have no recourse, upon dissolution or otherwise, against any Board or Investing Member.

10.10   <u>Change in Interest</u>:  If any Member's Company Interest is reduced, but not eliminated, because of the admission of new Members or otherwise, the Member's interest in the unrealized receivables of the Company as defined in Section 751 of the Code that were owned by the Company while such Person was a Member shall not be reduced, but shall be retained by the Member so long as the Member holds an Interest and so long as the Company has an interest in such unrealized receivables.

10.11   <u>Payment of Fees</u>:  In the event that the deduction of any fee paid or incurred out of Cash Flow by the Company to a Member or an Affiliate is disallowed for federal income tax purposes by the Internal Revenue Service with respect to a taxable year of the Company, the Company shall allocate to the Member, or such Affiliate, to the fullest extent possible, an amount of gross income of the Company for such year equal to the amount of such fee which is disallowed.

10.12   <u>Authority of Board to Vary Allocations to Preserve and Protect Members' Intent</u>:

(1)   It is the intent of the Members that each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined and allocated in accordance with this Section 10 to the fullest extent permitted by Section 704(b) of the Code.  In order to preserve and protect the determinations and allocations provided for in this Section 10, the Board is authorized and directed to allocate income, gain, loss, deduction, or credit (or item thereof)

arising in any year differently than otherwise provided for in this Section 10 to the extent that allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in Section 10 would cause the determination and allocation of each Member's distributed share of income, gain, loss, deduction or credit (or item thereof) to not be permitted by Section 704(b) of the Code and Treasury Regulations promulgated thereunder. Any new allocation (the "New Allocation") made pursuant to this Section 10.12 shall be deemed to be a complete substitute for any allocation otherwise provided for in this Section 10, and no amendment of this Agreement or approval of any Member shall be required.

(2)     In making any New Allocation under Section 10.12(1), the Board is authorized to act only after having been advised by the Accountants to the Company that, under Section 704(b) of the Code and the Treasury Regulations thereunder, (i) the New Allocation is necessary, and (ii) the New Allocation is the minimum modification of the allocations otherwise provided for in this Section 10 necessary in order to assure that, either in the then current year or in any preceding year, each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) is determined and allocated in accordance with this Section 10 to the fullest extent permitted by Section 704(b) of the Code and the Treasury Regulations thereunder.

(3)     If the Board is required by Section 10.12(1) to make any New Allocation in a manner less favorable to the Investing Members than is otherwise provided for in this Section 10, then the Board is authorized and directed, insofar as it is advised by the Accountants to the Company that it is permitted by Section 704(b) of the Code, to allocate income, gain, loss, deduction, or credit (or item thereof) arising in later years in such a manner so as to bring the allocations of income, gain, loss, deduction, or credit (or item thereof) to the Investing Members as near as possible to the allocations thereof otherwise contemplated by this Section 10.  Furthermore, in the event that any New Allocation requires repayment by the Investing Members of any distribution made during any tax year, the Investing Members shall be required to refund to the Company only amounts in excess of the net tax cost to the Investing Member based upon the original allocation.  For example, if a Investing Member's tax rate was twenty percent (20%) and the distribution to such Investing Member was $100.00, the Investing Member would only be required to refund $80.00 of the distribution.

(4)     New Allocations made by the Board under Section 10.12(1) in reliance upon the advice of the Accountants to the Company shall be deemed to be made pursuant to the fiduciary obligation of the Board to the Company and the Investing Members, and no such allocation shall give rise to any claim or cause of action by any Investing Member.

(a)     Withholding Taxes with Respect to Members.  The Company shall comply with any withholding requirements under federal, state, local and foreign law and shall remit any amounts withheld to, and file required forms with, the applicable jurisdiction.  All amounts withheld from Company revenues or distributions by or for the Company pursuant to the Code or any provision of any federal, state, local or foreign law, and any taxes, fees or assessments levied upon the Company, shall be treated for purposes of this Section 10.12 as having been distributed to those Members who received tax credits with respect to the withheld amounts, or whose identity or status caused the withholding obligations, taxes, fees or assessments to be incurred.  If the amount withheld was not withheld from the affected Member's actual share of cash available for distribution, the Board on behalf of the Company may, at its opinion (a) require such Member to reimburse the Company for

such withholding or (b) reduce any subsequent distributions to which such Member is entitled by the amount of such withholding. Each Member agrees to furnish the Company with such representations and forms as the Board shall reasonably request to assist it in determining the extent of, and in fulfilling, the Company's withholding obligations, if any. As soon as practicable after becoming aware that any withholding requirement may apply to a Investing Member, the Board shall advise the Investing Member of such requirement and the anticipated effect thereof. Each Member shall pay or reimburse to the Company all identifiable costs or expenses of the Company caused by or resulting from withholding taxes with respect to such Member.

10.13 Tax Distributions. The Board shall make good faith efforts to cause the Company to distribute to all Members within ninety (90) days after the close of each fiscal period of the Company in accordance with Sections 10.6 above, distributions which together with the other distributions to Members made with respect to such fiscal period equal to at least twenty percent (20%) of the Members' respective anticipated allocation of taxable items pursuant to Section 10.7 above.

11.    **SALE, DISSOLUTION AND LIQUIDATION.**

11.1    Dissolution of Company: Subject to the provisions of Section 4, the Company shall be dissolved on the earlier of the expiration of the term of the Company, or upon:

(1)    The passage of ninety (90) days after the sale or other disposition of all the Company property or, in the event of an installment sale of the Company property, after the final payment is received;

(2)    Subject to the second sentence of Section 12.3, by the determination of the Board with the prior written consent of the Majority in Interest of the Investing Members.

(3)    Subject to the second sentence of Section 12.3, the Board, with the prior written consent of a Majority in Interest of the Investing Members, shall determine to dissolve the Company;

(4)    The sale or other disposition by the Company of all or substantially all of its Property, unless the Company, as part of the consideration for any such sale or other disposition acquires a mortgage or lease on or security interest in all or substantially all of such Property, in which case the Company shall be dissolved following the sale or other disposition of its entire interest in such mortgage, lease or security interest; or

(5)    Any other event causing the dissolution of the Company under the laws of the State of Delaware.

11.2    Winding Up and Distribution:

(1)    Except as otherwise expressly permitted under this Agreement, upon the dissolution of the Company, the Company shall be liquidated by (1) the Board, or (2) if they are unable to agree, by the Company's Accountants. In carrying out the liquidation of the Company, the liquidating trustee shall have all of the rights and powers of the Board hereunder.

(2)     A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of the Company's liabilities so as to enable the liquidating trustee to minimize the normal losses attendant to liquidation.  The operations of the Company shall continue during such liquidation solely for the purpose of winding up the Company's business.  Upon completion of the liquidation each of the Members shall be furnished with a statement setting forth the assets and liabilities of the Company as of the date of complete liquidation.  Upon approval of this statement by a Majority in Interest of the Investing Members, the liquidating trustee shall cause a certificate of cancellation of the Company to be duly prepared, executed and filed causing the dissolution of the Company under the laws of the State of Delaware.  Nothing herein shall be construed as a limitation upon or termination of any of the rights of the Investing Members during or following any liquidation.

(3)     The proceeds of any liquidation shall be applied and distributed as set forth in Section 10.8 hereof.  It is the intent of the Members that, upon liquidation of the Company, any liquidation proceeds available for distribution to the Members be distributed in accordance with the Members' respective Capital Account balances, and the Members believe that distributions under Section 10.8 will effectuate such intent.  In the event that, upon liquidation, there is any conflict between a distribution under Section 10.8 and the intent of the Members with respect to this matter, the liquidating Trustee shall distribute any liquidation proceeds available for distribution to the Members in accordance with the Members' respective Capital Account balances, notwithstanding the provisions of Section 10.8.

12.     **INVESTING MEMBERS.**

12.1     <u>Admission</u>:  The Board is authorized to admit to the Company Investing Members.

12.2     <u>Limitation on Investing Member Liabilities</u>:  No Investing Member will be subject to assessment nor be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount committed by him, her or it to be contributed to the capital of the Company; provided, that a Investing Member receiving a distribution in return, in whole or in part, of his, her or its capital contribution shall be liable to the Company for any sum, not in excess of such amount returned, plus interest thereon, necessary to discharge liabilities to any or all creditors of the Company who extend credit or whose claims arise before any such distribution is made.

12.3     <u>No Control of Business or Right to Act for Company</u>:  A Investing Member shall take no part in the management, conduct or control of the business of the Company and shall have no right or authority to act for or to bind the Company, except as otherwise set forth in this Agreement.  Action may be taken by Investing Members owning less than 100% of the Limited Company Interests to amend this Agreement pursuant to Section 16, to continue the business of the Company in a reconstituted form as a successor limited partnership pursuant to section 14.6 and 14.7, or to elect a successor general partner pursuant to Section 14.7, only if, prior to the taking of such action, either (a) a court of competent jurisdiction shall determine, in an action for declaratory judgment or for similar relief brought by or on behalf of the Investing Members (but not by the Board), that neither the grant nor exercise of the right to take such action will be deemed taking part in the control of the business of the Company or will result in the loss of any Investing Member's limited liability, or (b)

the Investing Members shall receive an opinion of counsel, reasonably satisfactory to and selected by a Majority in Interest of the Investing Members, to such effect.

12.4     No Priority:  No Investing Member shall have priority over any other Investing Member either as to the return of his, her or its original contribution to the capital of the Company or as to distributions.

12.5     Registered Holders:  Upon the admission of a Investing Member, his, her or its address and Limited Company Interest shall be registered on the records of the Company maintained at its principal office and inserted in an amended and updated Schedule 1 hereto.

12.6     Death or Incompetency:  Upon the death or legal incompetence of an individual Investing Member (including a substituted Investing Member), the legally authorized personal representative of such individual shall have all of the rights of a Investing Member for the purpose of settling or managing such individual's estate and shall have such power as such individual shall have possessed to make a transfer of such individual's Limited Company Interest in accordance with the terms of Section 13 and to join with any assignee in making  application to substitute such assignee as a Investing Member.

12.7     Other Events:  Upon the bankruptcy or insolvency of any Investing Member, or the dissolution or other cessation to exist as a legal entity of any Investing Member which is not an individual, the authorized representative of such individual or entity shall have all of the rights of a Investing Member for the purpose of effecting the orderly winding up and dissolution of the business of such entity and such power as such individual or entity possessed to make an assignment of its Limited Company Interest in accordance with the terms of Section 13 and to join with any assignee in making application to substitute such assignee as a Investing Member.

12.8     Withdrawal of Members:  No Member may voluntarily withdraw or resign as a Member of the Company, prior to the dissolution and winding up of the Company, without the Board's prior written consent.

12.9     Nature of Members' Interest:  Member Interests in the Company shall be personal property for all purposes. No Member or their successor, representative or assign, shall have any right, title or interest in specific Company property.

12.10     Mandatory Redemption:  If a Person is admitted as a Investing Member of the Company but thereafter receives a denial from the USCIS of its EB-5 Conditional Approval, such that such Investing Member is ineligible to receive an EB-5 visa by reason of its ownership of Member Interests, then the Company shall promptly following such demand cancel all such Investing Member's Member Interests and return to such person its share of the capital contribution of Five Hundred Thousand Dollars ($500,000) for his or her Unit.  If a Investing Member receives a denial of its EB-5 Conditional Approval and elects to appeal that denial at its own expense and the Board consents to same, the cancellation of such Investing Member's Member Interest shall be deferred until the appeal is resolved and such Investing Member receives EB-5 Conditional Approval, in which event no cancellation will occur, or until the denial is affirmed, in which event the redemption will proceed. If determined by the Developer, no additional documents will be necessary to effect such

cancellation; it being agreed by the Members and Investing Members that the Company's delivery of a check for such amount to cancelled Investing Member, and such Investing Member's acceptance or deposit of such amount by such Investing Member, shall constitute the full and complete redemption of all of such Investing Member's Member Interests of the Company. The Board may unilaterally amend Schedule A to reflect the deletion of any Investing Members so cancelled and to reflect the increase in other Members' Member Percentages resulting from same.

12.11   Rights of a Representative:  Upon the death, Permanent Disability, incompetence or Bankruptcy of an individual who is a Member, his personal representative, guardian, trustee or Person serving in a similar capacity, as the case may be, shall have all of the rights of a Member for the purpose of settling or managing his estate, and such power as the decedent, incompetent, or bankrupt possessed to constitute a successor as an Assignee and to join with such Assignee in making application under this Section 12 to substitute such Assignee as a Member. Upon the adjudication of Bankruptcy, dissolution or other cessation of existence as a legal entity of a Member which is not an individual, the authorized representative of such entity shall have all of the rights of a Member for the purpose of effecting the orderly winding-up and disposition of the business of such entity and such power as such entity possessed to constitute a successor as an Assignee and to join with such Assignee in making application to substitute such Assignee as a Member. However, such representative or trustee shall not, by virtue of that capacity alone, have the right to become a substituted Member in the place of his predecessor in interest unless the conditions of Section 13 are satisfied.

13.   **RESTRICTIONS ON TRANSFER OF INVESTING MEMBER INTERESTS.**

13.1   Conditions Precedent to Transfer:  No Investing Member shall have the right to sell or assign all or any part of such Member's Interest except by reason of death, unless such assignment is effected by (a) written instrument in form and substance acceptable to counsel for the Company, stating that the assignee intends to be substituted or admitted as a Investing Member and accepts and adopts all of the terms and provisions of this Agreement, as the same may have been amended, and providing for the payment of all reasonable expenses incurred by the Company in connection with such substitution or admission, including but not limited to the cost of preparing the necessary amendment to this Agreement; (b) the consent to such assignment of the Board, which consent shall not be unreasonably withheld; (c) if requested by the Board, delivery to the Board of an opinion of acceptable legal counsel stating that the substitution or admission is exempt from registration and qualification under the Act and any applicable state securities laws; and (d) such assignment complies with the terms of the Loan Documents. The Board may not consent to any transfer or assignment of a Membership Interest (i) to a minor or person adjudged incompetent; (ii) under circumstances which would result in the termination of the Company under the Code; or (iii) which would result in a breach or default by the Company under any material contracts or agreements.

13.2   Legend:  Any certificate representing a Limited Company Interest shall bear on the face thereof legends substantially in the following form:

"THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), IN

8903004.8                                                22

RELIANCE UPON THE EXEMPTIONS FROM REGISTRATION PROVIDED IN SECTIONS 3(B) AND 4(2) OF THE ACT AND IN REGULATION S PROMULGATED UNDER THE ACT, NOR WITH ANY STATE SECURITIES REGULATORY AUTHORITY IN RELIANCE UPON PARTICULAR STATUTORY TRANSACTIONAL EXEMPTIONS. IT IS UNLAWFUL TO CONSUMMATE A SALE OR OTHER TRANSFER OF THIS SECURITY WITHOUT PRIOR RECEIPT OF AN OPINION OF COUNSEL FOR THE COMPANY TO THE EFFECT THAT SUCH PROPOSED SALE OR OTHER TRANSFER DOES NOT AFFECT THE EXEMPT STATUS OF THE ORIGINAL ISSUANCE AND SALE OF THIS SECURITY AND IS IN COMPLIANCE WITH ALL APPLICABLE STATE AND FEDERAL SECURITIES LAWS."

13.3    <u>Mechanics of Substitution or Admission</u>:  Any substitution or admission of an Investing Member shall become effective as of the last day of the calendar month in which all the conditions of such substitution or admission as specified in Section 13.1 shall have been satisfied. Any person admitted as a substitute or additional Investing Member pursuant to this Section 13 shall (except as herein otherwise expressly provided) be a Investing Member for all purposes of this Agreement to the extent of the Interest acquired by such person.

13.4    <u>Prohibited Assignments</u>:  Any purported assignment of an Interest otherwise than in accordance with this Section 13 shall be of no effect as between the Company and the purported assignee and shall be unenforceable as against the Company or the Board.  The Board shall not be charged with actual or constructive notice of any such purported assignment and is expressly prohibited from making allocations and distributions hereunder in accordance with any such purported assignment.

14.    **MISCELLANEOUS FINANCIAL AND ACCOUNTING MATTERS.**

14.1    <u>Availability of Financial Records</u>:  At all times during the existence of the Company, the Board shall keep or cause to be kept accurate and complete books of account in accordance with generally accepted accounting principles applied in a consistent manner, which shall reflect all Company transactions (including capital contributions, income, expense, gain, loss and distributions) and shall be appropriate and adequate for the Company's business.  Such books shall be maintained at the principal place of business of the Company.  Any Member or his duly authorized representative shall have the right, at his expense, to inspect and copy from such books and documents during normal business hours upon reasonable notice.

14.2    <u>Financial Reports</u>:  As soon as practicable after the close of the fiscal year of the Company, and in any event within 90 days thereafter, the Board shall deliver to each Investing Member a financial report of the Company for such period, including: (a) a balance sheet, (b) a profit and loss statement, (c) a statement showing the source and amount of distributions made to the Members and the allocation to each Member of Company income, gain, loss, deductions, credits and items of tax preference, and (d) full disclosure of such other matters as may be material to the financial operations of the Company or to an understanding by the Investing Members of such operations.  Such statements need not be audited but shall be on a basis consistent with the

Company's method of accounting and shall be certified by the Board as complete and correct, subject to changes resulting from year-end adjustments.

14.3    Independent Audit:  Upon the written request of a Majority Interest of the Investing Members, the financial records of the Company shall be audited as of the close of any fiscal year, at the expense of the Company, by such reputable firm of independent certified public accountants as the Board shall designate.

14.4    Accounting Decisions:  All decisions as to accounting principles and procedures, except as specifically provided to the contrary herein, shall be made by the Board in accordance with the recommendations of the Company's Accountants.

14.5    Taxable and Fiscal Year:  The Company's taxable and fiscal years shall be selected by the Board so as to be advantageous to the Company.

14.6    Income Tax Information:  Each Member shall be provided with a copy of the Company's annual income tax return, and such additional data as is necessary to adequately disclose each class of income, gain, loss or deduction acquired or incurred by the Company during the preceding taxable year and each Member's distributive share thereof.  Such return and data shall be furnished as soon as practicable after the close of the Company's taxable year, and at least one week prior to the due date (without extension) of the filing of such return with the Internal Revenue Service.

14.7    Maintenance of Cash Assets:  All cash funds of the Company from whatever source received shall be invested in short term governmental or corporate securities or in cash items such as money market funds or certificates of deposit, or may be deposited and maintained in one or more Company accounts located at the financial institution designated by the Board and/or the Agent.  All withdrawals from any such account or sale of any such investment shall be made upon the signature of the Board, or by such other individual(s) as may be authorized in writing by the Board.

14.8    Basis Election:  Upon the transfer of a Limited Company Interest, or a distribution of Company property, the Company shall have the right, but not the obligation, to elect pursuant to Section 754 of the Code to adjust the basis of Company property as allowed by Section 734(b) and 743(b) of the Code; provided, however, that if such an election is made, the Company shall not be required to make (and shall not be obligated to bear the expense of making) any accounting adjustments resulting from such election in the information supplied to any Member.

15.    **AMENDMENTS.**

15.1    Procedure for Amendment:  Subject to the terms of Articles 15 and 16 hereof, Agreement may be amended only upon the written consent of the Board and a Majority in Interest of the Investing Members; provided, that this Agreement shall not be amended so as to reduce the allocations to the Investing Members provided in Section 10. hereof unless such reduction has first been consented to in writing by all of the Investing Members.  The Board may amend this Agreement without the written consent of a Majority in Interest of the Investing Members: (a) if advised by counsel to the Company that such amendment is required to avoid having the Company treated as an

association taxable as a corporation; and if after ten days written notice to the Investing Members of the proposed amendment, the Company has not received written objections from any of the Investing Members, or (b) for the reasons set forth in Section 15.2(1) or (2) hereof.

15.2    Reasons for Certain Amendments:  This Agreement shall be amended whenever:

    (1)    There is a change in the name of the Company or the amount or character of the contribution of a Investing Member;

    (2)    A person is substituted or otherwise admitted as a Investing Member;

    (3)    There is a change in the character of the business of the Company;

    (4)    The Agreement contains a materially inaccurate statement;

    (5)    A time is fixed for dissolution of the Company or the return of contributions in contravention to the time specified in this Agreement;

    (6)    There is a change in any right to vote given by this Agreement to a Investing Member on matters affecting the basic nature of the Company; or

    (7)    A third party lender to the Company requires an amendment that is consistent with the provisions of Section 16.3 hereafter.

16.    **POWER OF ATTORNEY.**

16.1    Description:  Each Investing Member hereby irrevocably constitutes and appoints the Board, with full power of substitution, as his true and lawful attorney-in-fact on his behalf and in his name, place and stead, to make, execute, consent to, swear to, acknowledge, publish, record and/or file the following:

    (1)    A Certificate of Limited Liability Company, a Fictitious Name Registration and any other certificate or instrument which may be required to be filed by the Company or the Members under the laws of any jurisdiction, to the extent that the Board may reasonably deem such filing to be appropriate, including any and all amendments or modifications thereto;

    (2)    Such instruments as may be required to effectuate the dissolution and termination of the Company pursuant to the provisions of this Agreement;

    (3)    Any and all consents for the admission of substituted Investing Members, pursuant to the terms of this Agreement; and

    (4)    Such other instruments as the Board may reasonably deem appropriate to fully carry out the provisions of this Agreement in accordance with its terms, including the pledge of Company Interests to secure bridge or mezzanine financing obtained by the Company.

16.2    Characteristics of Power:  The grant of the foregoing power of attorney is coupled with an interest; shall be irrevocable and binding on any assignee of all or any part of a Limited

8903004.8                                                25

Company Interest; shall survive the death, legal incapacity, bankruptcy or insolvency of any Investing Member during the term hereof; and shall survive the delivery of any assignment by any Member of the whole or any portion of his Limited Company Interest; and any assignee of a Investing Member hereby constitutes and appoints the Board as his attorney in the same manner and force and for the same purposes as does the assignor.

16.3    Limitations of Power of Attorney:  No document or amendment executed by the Board pursuant to this Section 16 shall, in the absence of the prior consent of all of the Investing Members, (a) reduce the obligations of the Board, (b) affect the rights or restrictions regarding the assignability of Limited Company Interests, (c) modify the term of the Company, (d) amend this Section 16, or (e) reduce the rights or interests or enlarge the obligations of the Investing Members. The Board shall promptly notify the Investing Members of any documents or amendments executed pursuant to this Section 16.

## 17.    MEETINGS; MEANS OF VOTING.

17.1    Meetings:  Meetings of the Members shall be called by the Board at its discretion, or whenever requested in writing to do so by Investing Members owning 25% or more of the Limited Company Interests (whether or not held by investors affiliated or unaffiliated with the Board).  The call shall state the reason for the meeting.  Notice of any such meeting shall be delivered to all Members in the manner prescribed in Section 17.2 not less than ten (10) days or more than sixty (60) days prior to the meeting.

17.2    Record Date:  For the purpose of determining the Investing Members entitled to vote at any meeting of the Company, the Board or the Investing Members requesting such meeting may fix in advance a record date for any such determination of Investing Members.  Such date shall not be more than 50 days nor less than 10 days before any such meeting.

17.3    Proxies:  An Investing Member may authorize any person to act for him by proxy on all matters in which he is entitled to participate or vote.  Every proxy must be signed by the Investing Member or his attorney-in-fact.  No proxy shall be valid after the expiration of 11 months from the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable at the pleasure of the Investing Member executing it.

17.4    Conduct of Meetings:  Each meeting of the Members shall be conducted by the Board or such other person(s) as it shall appoint and pursuant to rules of conduct as it shall reasonably deem appropriate.

17.5    Quorum for Meetings:  There shall be deemed to be a quorum at any meeting of the Investing Members at which the voting power of the Investing Members attending such meeting plus the voting power exercised by Investing Members who have submitted to the Board effective proxies or written consents to action at such meeting constitutes a Majority in Interest of such Members.

## 18.    WITHDRAWALS.

An Investing Member may not withdraw from the Company unless the Board consents to such withdrawal, which consent may be withheld in the Board's sole discretion.   All expenses

incurred by the Company in connection with such withdrawal shall be paid for by the withdrawing Investing Member.

19.   **REPRESENTATIONS OF THE MEMBERS.**

By their execution below, each Person as an inducement to be admitted to the Company as a Member represents and warrants to the Manager and the Company as follows:

(a)   The Person has the requisite legal and mental capacity to acquire the Member Interest and enter into this Agreement.

(b)   The Person is an "accredited investor" (as such term is defined in Rule 501(a) of the Securities Act of 1933, as amended) and a sophisticated investor by virtue of its education, training and/or numerous prior investments made on its own behalf or through entities which it, alone or with others, controls.  The Person is knowledgeable and experienced in financial and business matters, especially in investments which are similar to the Company's Business, and which have risks similar to those which may be encountered by the Company.  The Person is capable of evaluating the merits and risks of an investment in the Company.  The Person is not a "U.S. Person" as such term is defined in Regulation S promulgated under the Securities Act of 1933, as amended.  The Person did not receive an Offering Memorandum or any other offering materials, nor did the person receive an offer to purchase Member Interests in the Offering, while within the United States and did not execute their order to purchase Member Interests, by completing and delivering their Subscription Agreement and Capital Contribution as required by the Offering, from within the United States.

(c)   The Person has been furnished or otherwise obtained all information necessary to enable it to evaluate the merits and risks of his prospective investment in the Company.  The Person recognizes that the Company has no prior operating history, and may incur leverage that involves certain risks.  The Person recognizes that the Project is in the development stage, there is no guarantee that the Project will be fully developed in accordance with current plans or if it is so developed that it will be developed in the levels and at the times currently predicted, and its future profitability or existence cannot be guaranteed.  Even if the Project is completed and economically profitable, this does not assure that the Loan made by the Company will be repaid.  The Company has no operating history. An investment in the Company is highly speculative and the Person may suffer a complete loss of its investment.

(d)   The Person has been furnished or has had access to any and all material documents and information regarding the Company, TPIoNY and Management.  The Person has had an opportunity to question TPIoNY and its officers, directors, partners, trustees, or other Persons who control or manage the Board, and receive adequate answers to such questions. The Person hereby acknowledges that the Company has made available to the Person prior to any investment in the Company the Offering Memorandum and its exhibits, and all information requested by the Person and reasonably necessary to enable the Person to evaluate the risks and merits of an investment in the Company. The Person, after a review of this information and other information it has obtained, is aware of the speculative nature of any investment in the Company.

(e)     The Person is aware that the Person will have to make the Capital Contributions required hereunder. The Person can bear the economic risk of the investment in the Company (including the possible loss of his entire cash payment) without impairing the Person's ability to provide for himself and/or his family in the same manner that the Person would have been able to provide prior to making an investment in the Company. The Person understands that it must continue to bear the economic risk of the investment in the Company for an indefinite period of time.

(f)     The Person understands that the Member Interests have not been registered under the Securities Laws, inasmuch as the offering of Member Interests is being made to a limited group of potential investors and/or potential investors who are not residents of the United States, pursuant to applicable exemptions under the Securities Laws. The Person understands that it has no rights whatsoever to request, and that the Company is under no obligation whatsoever to furnish, a registration of the Member Interests under the Securities Laws.

(g)     The Member Interest that the Person is acquiring is being acquired solely for its own account and is not being purchased with a view to, or for resale in connection with, any distribution within the meaning of the Securities Laws. The Person will not resell or offer to resell any Member Interests except in accordance with the terms of this Agreement and in compliance with all applicable Securities Laws, including Regulation S under the Securities Act of 1933, as amended, nor shall the Person conduct any hedging transactions involving the Member Interest except in compliance with the Securities Laws. Depending on the particular exemption from registration under the Securities Laws pursuant to which the Person acquires the Member Interests, as determined by the Company, such exemption may impose additional restrictions on the ownership and transferability of such Member Interest.

(h)     The Person acknowledges that there is no current market for the Member Interests and none is anticipated to develop. Moreover, there are substantial restrictions on the Transfer of the Member Interests. Therefore, the Person has considered its prospective investment in the Company to be a long-term illiquid investment acceptable because the Person is willing and can afford to accept and bear the substantial risks of the investment for an indefinite period of time.

(i)     The Person acknowledges that an investment in the Member Interests may be beneficial to foreign investors seeking lawful permanent residency in the United States pursuant to an EB-5 visa issued by the USCIS, as more fully described in the Offering Memorandum. Failure of a Member to continue to own all the Member Interests it acquires may result in the denial of lawful permanent residence as an outcome of its investment in the Member Interests. There are other requirements of the USCIS's EB-5 visa program which the Person must satisfy or risk denial of its EB-5 Conditional Approval or its status as a conditional lawful permanent resident, as more fully described in the Offering Memorandum.

(j)     The Person is aware that there is no assurance, representation or warranty, by any Person, that any assets of the Company will operate at a profit, will generate sufficient cash flow for Distribution to the Members, or will appreciate in value or be sold at a profit. This may require the Members to report and pay tax on income without having received contemporaneous cash Distributions, even if the Company is profitable.

(k)    The Person understands that if it receives a Distribution from the Company in excess of that permitted by Law, the Person may be liable for the amount of such excess Distribution.

(l)    The Person understands that major changes were made by tax laws enacted in the past, and more will likely be enacted in the future. The Person is aware that he should understand that the tax consequences of an investment in the Company are subject to change. The Person is further aware that this Agreement contains complex tax attribute allocations. The Person agrees that the Company and the Board have not, will not, and cannot assure the Person that such allocations will be respected for federal income tax purposes by the United States Internal Revenue Service ("IRS"). Depending on which allocations were to be disregarded if challenged by the IRS, the Person's share of income, gains, losses, deductions and credits of the Company could be affected and could change. In such an event, the Person may have to amend its tax return for the year or years of such change(s).

(m)    The Person understands that the income tax treatment of the Company and the ownership of Member Interests, whether direct or indirect, are complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. It is possible that the IRS may successfully challenge the tax treatment accorded certain items by the Company.

(n)    The Person is aware that the IRS may audit the income tax returns of the Company and may audit the Person's income tax return (if applicable) as the result of the Person's investment in or claimed deductions or losses from its investment in the Company. Such deductions and losses, when taken together with other items reported on the Person's tax return, may prompt the IRS to examine the Person's return, both as to income and deductions relating to the Company and as to other matters. The Company cannot assure the Person that such an audit or examination will not occur or that the Person will not incur additional liability and costs as a result of any such audit or examination.

(o)    The Person understands that the Company may have the authority to negotiate, settle and compromise matters with the IRS relating to all Members of the Company. The Manager may take positions on issues or effect compromises binding on all Members which the Manager believes are in the best interests of the Company, but which may not be in the best interests of individual Members, including such Person. In the event of audit, each Person must consult with its own tax advisor with respect to such Person's rights and obligations.

20.    **MISCELLANEOUS.**

20.1    Copies of Documents:  Promptly upon the execution and delivery of this Agreement, the Developer shall deliver to each Investing Member a conformed copy of this Agreement and of the Certificate (in the form in which it has been filed).

20.2    Notices:  Any notice, payment, demand, offer or other communication required or permitted to be given by any provision of this Agreement shall be deemed to have been delivered and given for all purposes (a) if personally delivered, or (b) whether or not actually received, if sent by registered or certified mail, postage prepaid, addressed as follows:

(1)    if to the Company, at the mailing address of TPIoNY set forth below.

(2)    if to an Investing Member, at the address of such Investing Member set forth in Schedule 1 hereto or such other address as such Investing Member may designate by notice to the Company.

(3)    if to an Investing Member, at the address of such Investing Member set forth in Schedule 1 hereto or such other address as such Investing Member may designate by notice to the Company.

All notices except notices of change of address shall be deemed given when mailed, and notices of change of address shall be deemed given when received.

20.3    <u>Arbitration</u>: Any dispute, controversy or claim arising out of or in connection with, or relating to, this Agreement or any breach or alleged breach hereof, except allegations of violations of federal or state securities laws, shall, with the consent of the Board (which must be given, if at all, in writing and within ten days of the date such matter matures), be submitted to and settled by arbitration in the State of Delaware, pursuant to the rules then in effect of the American Arbitration Association (or at any other place or under any other form of arbitration mutually acceptable to the parties so involved), with venue in Delaware City, New York. Any award rendered shall be final and conclusive upon the parties, and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction. The expenses of the arbitration shall be borne equally by the parties thereto provided that each party shall pay for and bear the cost of its own experts, gathering of evidence and counsel's fees, except that in the discretion of the arbitrator, any award may include the cost of the party's counsel fees if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or that such matter is frivolous.

20.4    <u>Remedies: Specific Performance</u>: The Company and the Members shall be entitled to all available legal and equitable remedies against each other, including specific performance of the obligations to make Capital Contributions on the terms set forth herein, and recovery of all damages or losses of the Company caused by any Member's default (including, without limitation, attorney's fees and costs paid or incurred in any legal or equitable action).

20.5    <u>Severability</u>: Each provision hereof is intended to be severable, and the invalidity or illegality of any portion of this Agreement shall not affect the validity or legality of the remainder hereof.

20.6    <u>Captions</u>: Paragraph captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend, or describe the scope of this Agreement or the intent of any provision hereof.

20.7    <u>Person or Gender</u>: The masculine gender shall include the feminine and neuter genders, the singular shall include the plural, and the word "person" shall include an individual, corporation, trust, partnership or other form of association.

20.8    <u>Binding Agreement</u>:  Subject to the restrictions on assignment herein contained, the terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, the successors, assigns, personal representatives, estates, heirs and legatees of the respective Members.

20.9    <u>Applicable Law</u>: Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of Delaware as now adopted or as may hereafter be amended and same shall govern the Company aspects of this Agreement.

20.10    <u>Entire Agreement</u>:  This Agreement constitutes the entire agreement of the parties hereto with respect to the matters set forth herein and supersedes any prior understanding or agreement, oral or written, with respect thereto.   There are no agreements, understandings, restrictions, representations, or warranties among the parties other than those set forth herein or herein provided for.

20.11    <u>Agreement in Counterparts</u>:  This Agreement may be executed in any number of counterparts and all so executed shall constitute one Agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatories to the original or the same counterpart.

20.12    <u>Qualification in Other Jurisdictions</u>:  In the event the business of the Company is carried on or conducted in one or more states in addition to the State of Delaware, the Company shall exist under the laws of each state in which business is actually conducted by the Company, and the parties will execute such further documents as may be appropriate in order that the Board may legally qualify the Company in each such state.   The power of attorney granted to the Board by each Investing Member in Section 16, shall constitute the authority of the Board to perform the ministerial duty of qualifying this Company under the laws of any state in which it is necessary to file documents or instruments of qualification.  A Company office or principal place of business in any state may be designated from time to time by the Board.

20.13    <u>Waiver of Partition</u>:  Each of the parties hereto irrevocably waives during the term of the Company any right to maintain any action for partition with respect to any Company property.

20.14    <u>Litigation</u>:  The Company shall prosecute and defend such actions at law or in equity as may be necessary to enforce or protect the interest of the Company.  The Company shall respond to any final decree, judgment or decision of any court, board or authority having jurisdiction in the premises.  The Company shall satisfy any such judgment, decree or decision, first out of any insurance proceeds available therefor, and next out of assets of the Company, and finally out of the assets of the Manager.  The cost of defending any actions brought against the Company and/or the Manager with respect to Company matters shall be borne by the Company except as otherwise provided in this Agreement.

20.15    <u>Time</u>:  Time is of the essence to this Agreement.

20.16    <u>Remedies Not Exclusive</u>:  Any remedies herein contained for a breach of obligation hereunder shall not be deemed to be exclusive, and shall not impair the right of any party to exercise any other right or remedy, whether for damages, injunction or otherwise.

20.17   Force Majeure:  If the Board or the Agent is rendered unable, in full or in part, by Force Majeure, to carry out its obligations under this Agreement, other than the obligations to make distributions to the Members, the obligations of the Board or the Agent, to the extent affected by such Force Majeure, shall be suspended during, but no longer than, its continuance.  The Board or the Agent shall use all reasonable diligence to remedy such Force Majeure as quickly as possible, provided that this obligation shall not require the settlement of strikes, lockouts, or other labor difficulties by the Board or the Agent and provided further that all such difficulties shall be handled entirely at the discretion of the Board or the Agent.

For purposes of this section, Force Majeure means an act of God, strike, lockout or other similar disturbance or interruption, act of a public enemy, war, blockage, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment and any other act or event, whether of the kind specifically enumerated above or otherwise, which is not within the control of the Board or the Agent.

20.18   Legal Counsel:  Legal counsel for TPIoNY or one of its Affiliates may also represent the Company in connection with legal work or issues arising in connection with the Company.  Each Member recognizes and acknowledges that any such counsel will be acting as legal counsel for the Company and TPIoNY with respect to each such matter and shall not be acting as the legal counsel of any individual Member.  Each Member further recognizes and accepts that its interest with respect to any such matter may be adverse to the interests of TPIoNY and of the Company.  Each Member nevertheless consents to the representation of the Company and TPIoNY by such counsel with respect to each such matter and waives for the benefit of TPIoNY of such counsel any potential or actual conflict of interest between or among such Members and between any such Members and the Company. Each Member acknowledges that in the event of any future dispute or litigation between or among the Members and/or between any of the Members and the Company, such counsel may continue to represent the Company, notwithstanding any such dispute and its prior representation of the Company.

20.19   Advice from Independent Legal Counsel; Voluntary Agreement:  Notwithstanding Section 20.18, the Members represent and warrant that (a) each of them has had the opportunity to be represented by legal and tax counsel of its choice, (b) each of them has had the opportunity to consult with such counsel regarding this Agreement, and (c) except as set forth herein, each of them has not relied in any way on any representation or other statement made by any other Member or its legal or tax counsel or by any other Person.

20.20   Patent Errors:  The Members hereby authorize and direct the Board to correct patent errors and to fill in any blanks, which blanks shall not be substantive to the terms hereof, in this Agreement or in any exhibit, instrument, document or agreement related hereto and to attach hereto or thereto any exhibits or schedules which are a part hereof or thereof.

20.21   Currency:  All references to "dollars" in this Agreement shall mean U.S. dollars.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date first above written.

WORLDWIDE   CAPITAL   MANAGEMENT, LLC, a Delaware limited liability company

By: _____,

Print Name: Yitzchok Lefkowitz
Its:           Managing Member
Dated:        December 21, 2010